IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED

SEP 2 5 2008

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

RICHARD W. LAMP, JR.,
          Plaintiff,

v.                                    CIVIL ACTION NO. 3:07CV130

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
          Defendant.

## OPINION/ REPORT AND RECOMMENDATION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross Motions for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of this Opinion/Report and Recommendation. 28 U.S.C. § 636(b)(1)(B).

## I. Procedural History

Richard W. Lamp, Jr. ("Lamp"), 51 years of age (DOB September 7, 1951) and a former welder by trade, filed concurrent Applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits on or about July 29, 2003, alleging onset of disability as of April 13, 2003 due to back, shoulder and leg pain and COPD. The applications were denied initially and on reconsideration (R. 18-29, 35-51, 223-243,16-17 and 5-8). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Slahta held on April 14, 2004 (R. 265). The

ALJ rendered a decision, finding that Plaintiff was not under a "disability."


## 11. Statement Of The Case

**Synopsis of the Relevant Portions of the Medical Record**

An October 11, 2001 MRI of Lamp's lumbar spine was read to show "slight disc space narrowing at L4-S1 and a generalized disc bulge at L4-5, not causing any canal stenosis or nerve root compression." R. 142.

Lamp was admitted to the United Hospital for treatment post motorcycle accident on April 12, 2003. Dr. John A. Bellotte wrote a consult note dated April 13, 2003 in which he stated: "His medications at home have included OxyContin 40 milligrams two a day and 20 milligrams two a day. He also uses Lorcet 10/5( ) t.i.d. and Xanax one milligram [sic] p.r.n. and all of this is taken for his back pain." Dr. Bellotte noted that Lamp had a history of smoking 3 packs of cigarettes per day for 46 years. He also noted that Lamp had some narcotic dependence. After examination of the skin abrasions and noting the in place chest tube, Dr. Bellotte noted: "The left pneumothorax[1] is being followed on the x-rays and he has a chest tube in place. I would like to avoid too much in the way of narcotic analgesic medications if at all possible. I realize that he has been on this chronically for his pain, however, it will decrease his respiratory drive and increase the possibility of atelectasis[2] and pneumonia." R. 138-139.

Dr. Bragg also saw and noted the condition of his long time patient on the 13th. In his two

_____

[1]An accumulation of air or gas in the pleural space, which may occur spontaneously or as a result of trauma or a pathological process, or be introduced deliberately. Dorland's Illustrated Medical Dictionary, 27th Edition.

[2]Incomplete expansion of a lung or a portion of a lung. Dorland's Illustrated Medical Dictionary, 27th Edition.

page report he noted that a CT of Lamp's cervical spine showed degenerative changes but not fractures. He also noted an approximate 40% pneumothorax and effusion and a hiatal hernia. A CT of the pelvis was negative. Dr. Bragg noted a history of degenerative arthritis of the back and a history of neck surgery 12 years prior. Dr. Bragg confirmed the narcotic prescriptions noted by Dr. Bellotte. R. 140-141.

Lamp filed two x-ray reports from United Hospital Center dated April 17, 2003 and April 18, 2003. Although read by two different readers, the impressions were the same. The x-ray on the 17th was read and reported to show: "Persistent infiltrates in the right middle lung and lower lobes with probable left pleural effusion; probable left pleural effusion; query 2-3% left apical pneumothorax with chest tube placement and fracture of the posterior right fourth and fifth ribs; also slight increased density of the right cardiophrenic angle which may also represent a minimal infiltrate. The x-ray on the 18[th] was read: "Probable persistence of a small apical pneumothorax on the left side; unchanged position of the left-sided chest tube, with postoperative changes in relation to left thoracotomy[3]; blunting of the costophrenic angle with obscuration of the hemidiaphragm in relation to left pleural effusion, and possible atelectasis and/or considation at the base." R. 134-137.

Lamp initially filed his disability claim on July 29, 2003. He then provided written information witnessed by his son[4] for a Form SSA 3368 indicating he was unable to work since April 30, 2001 due to "rheumatoid arthritis broken ribs due to motorcycle injury." The motorcycle accident and resultant injury occurred approximately four months prior to the July 29, 2003

---

[3]Surgical incision in the wall of the chest. Dorland's Illustrated Medical Dictionary, 27th Edition.

[4]Son came in and picked up Social Security disability forms contending his father (Lamp) was unable to come in due to pain from injuries he received in a motorcycle accident four (4) months earlier R. 90.

application.  Lamp indicated in the application that he was being treated by Dr. Dana Bragg through prescription medications (Lorcet and Oxycotin and Zanax).  At the time of filing he had a 10th grade education, work history that showed he worked the longest as a job superintendent of 11 men involved in steel erection.  At the time of application Lamp was 6'2" tall weighing 245 pounds.  R. 72-87.  In Application for Supplemental Security Income filed by Lamp on the same date, July 29, 2003, Lamp confirmed his claimed disability of April 20, 2001.  R. 219-221 and R. 230-234.[5]

A physical residual functional capacity assessment was performed by Peasick on October 18, 2003 finding: no exertional limitations, no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations.  R. 144-151.

Lamp's claim was initially denied at the state agency level on October 28, 2003.  R. 223-228.

On September 15, 2004, Lamp filed out a Function Report.  In it Lamp reported: "wake and get out of bed about 7:30 am.  Eat breakfast about 9:00 am.  I sit and watch TV for about one hour waiting for pain medication to work, then take a shower, get dressed, lay back down until about 1:00 o'clock pm.  Son comes by to fix laundry and lunch.  After he leaves about 3:00 pm go out side and sit in yard till about 6:00 pm.  Go back in house. Eat something.  Watch TV.  Go to bed about 10:00 pm" R.109.  Lamp stated he could not bend over and tie his shoes; could not clean house or do more than a small load of laundry; sometimes fixes sandwiches or micro-waves things for meals; was unable to stand for more than 30-45 minutes at a time with severe pain in the backs of his legs; doesn't shop for more than 30 minutes at a time; cannot walk for more than 100 yards without stopping to rest for 5 minutes; cannot bend to lift because of bending pain in lower back; cannot

_____

[5]No explanation is offered for the obvious inconsistency of a claim of disability onset as of April 2001 for injuries from a motorcycle accident that did not occur until April 2003.  However, Lamp does amend his onset date at the hearing to a date post 2003 motorcycle accident.

squat because his knees hurt; standing causes back pressure and walking causes the back of his legs to hurt; cannot kneel or climb stairs due to pain in knees and because they "release by themselves." R. 109-116.

Pursuant to a request of Social Security, Dr. Dana Bragg provided copies of Lamp's medical records covering the time period from November 2, 2001 through November 3, 2005. R. 171-218. The records, consisting of one page Periodic Adult Health Visit reports reveal that Dr. Bragg prescribed pain and anxiety medications for monthly complaints of low back pain, COPD and anxiety. In the report of May 28, 2003, Dr. Bragg noted the treatment for Lamp's motorcycle injuries. Starting with June 26, 2003 and continuing thereafter through the last Periodic Adult Health Visit report, the records revealed Dr. Bragg Treating Lamp for his complaints of low back pain, COPD and anxiety with occasional mention of pain in his shoulders around the time of his motorcycle wreck using narcotic pain medications. Id.

Lamp was examined by Kip Beard, M.D. on October 14, 2004. Dr. Beard reported the results of his examination of Lamp on October 18, 2004. Dr. Beard noted the April 2003 motorcycle accident with left rib fractures, left pneumothorax treated with chest tube, left shoulder blade fracture and a lower back injury. He noted Lamp was hospitalized for nine (9) days at United Hospital Center. He also noted that Lamp had a right anterior cervical discectomy and fusion 12 years earlier through Dr. Weinstein as a result of a herniated disc he suffered in a motor vehicle accident. Dr. Beard noted that Lamp: 1) did not complain of neck pain; 2) did complain of constant pain near his left shoulder blade and lower back with the back pain radiating into both legs (more on the right); 3) did not wear a back brace; 4) did notice some shallow breathing since age 30 or so; 5) did get out of breath walking steps; 6) has chronic productive cough and wheezing particularly in damp weather; 7) does not use inhalers; and 8) does smoke three (3) packs of cigarettes per day. Dr. Beard's

examinations of Lamp's GENERAL CONDITION, HEENT, NECK, CARDIOVASCULAR, ABDOMEN, EXTREMETIES, CERVICAL SPINE, ARMS, HANDS, KNEES, ANKLES AND FEET resulted in normal findings except the well healed right anterior neck scar from the discectomy. With respect to Lamp's CHEST, Dr. Beard found no increased AP diameter or prolonged expiratory component; no wheezes, rales or rhonchi in the lung fields and a "very mild degree of dypsnea after exertion without accessory muscle recruitment." With respect to Lamp's MUSCULOSKELETAL, LS SPINE AND HIPS, AND NEUROLOGIC EXAMINATION, Dr. Beard found: normal curvature of the dorsolumbar spine; some mild left thoracic paravertebral spasm; some left lumbar paravertebral tenderness without spasm; Lamp could stand on either leg alone; no leg length discrepancy; seated straight leg to 90 degrees without complaint; supine leg raising to 70 degrees with back pain on either side; hips without pain or tenderness; weakness of the left shoulder graded 4/5; no sensory loss in the extremities; no atrophy in the extremities; and the ability to heel walk, toe walk and tandem walk even though he had some difficulty with pain on squatting and arising from a squat. In summary Dr. Beard wrote: "The claimant is a 53 year old male with history of left shoulder blade fracture and lower back injury in a motorcycle accident in April 2003. He has ongoing upper and lower back pain. Examination does reveal some left thoracic paravertebral muscular spasm, left paravertebral lumbar tenderness, mild motion loss, negative straight leg raising and negative neurologic exam for lumbar radiculopathy. In regard to the shoulder blade fracture, there is some periscapular tenderness and pain with shoulder motion testing and some mild weakness at the left shoulder. Regarding the lungs, lungs were clear to auscultation. There was a mild degree of exertional dyspnea. Pulmony functions revealed moderate COPD and mild restriction." R. 152-162.

Mary Ann Cleavenger filled out a Physical Residual Functional Capacity Assessment on

November 3, 2004. Fulvio R. Franyutti, M.D. reviewed the medical evidence in the record and the November 3, 2004 assessment and approved the same as written on March 8, 2005 thereby concluding that Lamp could: occasionally lift and or carry 20 pounds; frequently lift and or carry 10 pounds; stand and or walk with normal breaks about 6 hours in 8; sit with normal breaks 6 hours in 8; push and or pull unlimited; never climb ladders, ropes, or scaffolds; occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl; had no manipulative limitations, visual limitations, or communicative limitations; and was to avoid all exposure to hazards such as machinery and heights plus avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, and fumes, odors, dusts, gases, poor ventilation, etc The reviewer concluded that Lamp appeared to be credible and appeared to retain the capacity for light RFC level work. R. 163-170.

On November 3, 2004, the same Mary Ann Cleavenger, Disability Examiner, determined Lamp was not disabled due to thoracolumbar strain and COPD-chronic pulmonary insufficiency. R. 229.

On March 3, 2005, Disability Examiner Sheila Heston, on reconsideration, with the oversight of Fulvio Franyutti, M.D., determined Lamp not disabled due to spinal disc disorders and other fractures of bones. R. 240. The notice of unfavorable decision was sent to Lamp and his counsel, Harold Bailey on March 7, 2005. R. 241-243.

March 29, 2005 Lamp prepared and filed a Disability Report-Appeal. He noted therein that he was being treated by Dr. Dana Bragg through medication management because of "chronic back pain, shoulder pain, migraine headache, nerves." Lamp listed his medications as: Hydrocodone, Protonix, Oxycontin 20, Oxycontin 40, Cansuprodol and noted "All medication prescribed by Dr. Bragg - significant side effect (drowsiness)". R. 127-133.

Lamp filed for reconsideration and submitted information on September 29, 2005 for Disability Report Form SSA 3368. Lamp stated he had back pain in his lower back, left shoulder pain, and right leg pain and a right knee that "goes out" R. 99. Lamp claimed he was disabled from performing the duties of his welding job he had held from 1999-2001 (used machines, lifted 50-100 pounds, did not supervise people, was not the lead worker) due to "constant back pain and right knee goes out" He specifically asserted his disability began April 30, 2001. R. 99-101).

A hearing was held before Administrative Law Judge Steven Slahta on November 15, 2005. At the hearing Lamp appeared in person and by Travis Miller, one of his counsel. Lamp testified. A vocational expert, Richard Panza, also testified.

At the outset of the hearing, Attorney Miller objected to exhibit 2-F being considered as medical evidence because it appeared to be a residual functional capacity form completed by a non-medical source. The ALJ agreed that it should have been in the E section of the file instead of the F section of the file. The ALJ then admitted exhibits 1-F through 7-F and proceeded with the taking of testimonial evidence. R. 252.

During the taking of evidence and at the beginning of Miller's examination of his client, Miller engaged the ALJ in a colloquy with respect to the alleged onset date of disability. Miller confirmed that the pled onset date was April 30, 2001. He then stated that Lamp had really intended that his onset date should be April 13, 2003 to co-inside with the motorcycle accident. The ALJ then stated: "Right. We contacted your office before this was assigned to me and that was refused." Miller, then asserted that it was his understanding that it was proposed to his office that the onset date be April 14, 2004 and that was what his office refused. The ALJ responded: "Oh, okay." Thereafter, Miller stated: "I would like to make clear, Your Honor, that Mr. Lamp has not, he did not refuse that. However, a couple of things happened. Number one, we had a very difficult time

getting a hold of Mr. Lamp. He had cell phones during the time that we've known him and it appears that he had one cell phone when we first met him and now he has a different cell phone and he's tried to use his cousin's cell phone and his son's cell phone. So, that was one problem that we had. The other problem that we had is that we've been in contact with his treating doctors, Dr. Bragg, with his office on numerous occasions. Originally, we had quite a bit of hope that Dr. Bragg was actually going to do something for Mr. Lamp in terms of writing a letter, explaining his condition back to the motorcycle accident. We've just run into one of these situations where Dr. Bragg has just not done anything. He sent the medical reports. Counsel then told the ALJ that Lamp wanted to amend his onset date to April 13, 2003 but would accept April 14, 2004 as a compromise date. The record of the colloquy found on 258 to 259 is confusing and does not appear to result in any clear acceptance by the ALJ of the offer to compromise made during the hearing by Lamp's counsel. R. 256-259.

The following is a summarization of the salient points of the relevant testimonial evidence presented to the ALJ during the evidentiary hearing:

1) Richard W. Lamp was born September 7, 1951. He quit high school in the 10th grade because he had to go to work to help support the family and his father wasn't present at the home to support or assist in supporting the family. R. 260.

2) Lamp is able to read and write and did not have problems with reading and writing when he was in school. R. 260.

3) Lamp learned the welding trade from his father.

4) Lamp last worked as a certified welder at the Harrison Power Plant when the union job on which he was working was completed in January, 2003. R. 252.

5) Lamp did not call into his local to see if work was available after his motorcycle wreck in

April 2003. R. 253.

6) During his work life as a union welder he worked on a number of jobs and managed the crew one of them. R.261. He filled out reports of the work he completed on forms provided by his employer. R. 260-261.

7) Lamp was involved in a motorcycle wreck April 2003. R.253. Lamp testified he suffered broken ribs, collapsed lung, shoulder blade shattered and spleen damage as a result of the motorcycle wreck. R. 254. Few hospital records of treatment for injuries sustained as a result of the motorcycle wreck were provided. R.3.

8) At the time of the hearing, Lamp was single (divorced); lived alone in an apartment in Clarksburg; had a valid driver's licence; did not own a car; drove very little; and smoked about a pack and a half of cigarettes per week as opposed to the three packs he used to smoke daily;. R. 254-255.

9) Lamp explained that the reports he stated he filled out on his July 29, 2003 disability application form were reports of the welds he had made on each work day and that the statement "he worked the longest as a job superintendent of 11 men involved in steel erection" contained in that same disability application meant he had been named the lead worker on a job 12 years ago because he was the most experienced welder on that job. He denied having any management duties. R. 260-262.

10) Lamp testified he had the following medical problems that affected his ability to work:

a. "can't stand for very long at a time. If I sit a get a little fidgety. My legs hurt a lot." R. 263.

   i. After the motor cycle wreck his legs pound continuously and he has pain running from his back down his legs. R. 264.

        ii.     He is not able to walk far without his legs and back hurting.  R. 264.

        iii.    The most he could walk before stopping is across the parking lot.  R. 265.

b.    "I can't breathe real good anymore." R. 263.

        i.     He tried to cut back gradually on his smoking in the past year.  R. 266.

        ii.    He notices pain in his lungs when there is a change in the weather and he goes outside.  R. 266.

c.    Prior to the motorcycle wreck he had pain in his back once in a while, but since the motorcycle wreck:

        i.     His back pain is "continuous." R. 263.

        ii.    The medication helps - it numbs him and then he is in a fog; "like you're in slow motion;" falls asleep during the day every day because he gets real drowsy from the medication. R. 264.

        iii.   He lays down with a heating pad on his back every day for a couple of hours.  R. 265.

        iv.   He does not lift anything more than 5 pounds on advice of Dr. Bragg since the motorcycle wreck.  R. 265.

        v.    He received some cortisone shots in his back from Dr. Bragg that helped relieve the pain.

        vi.   He claims to be claustrophobic which prevents him from having a MRI but did have an MRI in October 2001 at UHC after he took 4 Xanaxes and "just kind of passed out."  R. 272..

d.    Lamp denies problems with his left shoulder blade he broke in the wreck except that he feels a knot beneath it that Dr. Bragg told him was a calcium build-up from the

broken ribs underneath it and he says he does not have the same strength in his left arm that he had before. R. 267.

e.     He takes Lasix two to three times a week for fluid which makes him have to run to the bathroom about 30 minutes after taking the Lasix and then about every 10 to 15 minutes thereafter for about eight hours. He also puts his feet up daily in the afternoon for the swelling. He did not take his Lasix medication prior to the hearing out of concern he would have to go to the bathroom. R. 267-268.

f.     Lamp takes medicine (Xanax prescribed by Dr. Bragg) for anxiety but does not receive psychiatric treatment. R. 269, 271. He states that because he is unable to do anything, He gets "real fidgety or angry at the world or something." R. 269.

11)     Lamp testified he passed the time of day watching t.v.; talking to a few friends if they come by; talking with his son who visits daily to do the cooking, the house cleaning and run errands such as grocery shopping and picking up medications. R. 270, 275-278.

12)     Lamp admits he went to Florida for five weeks during the summer before the hearing with his cousin. He explained his cousin drove and they made lots of stops and he took a lot of pain pills over the three day trip down. He flew back. He denied fishing or working while in Florida. R. 273-275.

The ALJ asked the VE, John Panza the following hypothetical questions and received the following responses:

Q.     "Assume a [sic] individual approaching advanced age with a tenth grade education, light work with a sit/stand option, no hazards, no climbing, clean air. With those limitations, can you describe any work this hypothetical individual can perform?"

A.     "...[C]onsidering your hypothetical ... jobs would exist in the national economy, also in the

State of West Virginia. ... at the light level, unskilled, a position of a cashier 1,500,000 jobs in the national economy, at least 15,000 in the State of West Virginia. Also at the light level, unskilled, the position of a gate guard, 100,000 jobs in the national economy, minimally 700 in the State of West Virginia." R. 279.

Q.   "If I added, determined that anxiety was severe and that it impacted Mr. Lamp's functioning to the extent he could only perform unskilled, low stress work defined as one and two step processes, routine and repetitive tasks, primarily working with things rather than people, entry level. Are those jobs you named in hypothetical one still relevant?"

A.   "No, all those jobs would be working with people, ...."

Q.   "So, add that to the hypothetical and are there jobs you could name this hypothetical individual can perform?"

A.   " ... [J]obs would exist in the national and state economies .... At the light level the position of an assembler of a small parts, light, unskilled, at least 500,000 in the national economy, at least 3,300 in the State of West Virginia. Also, at the light level, unskilled the position of light housekeeping, 1,500,000 jobs in the national economy and at least 10,000 in the State of West Virginia, .... The position of cafeteria attendant at the light level, unskilled, at least 400,000 jobs in the national economy and at least 1,500 in the State of West Virginia, ...."

Q.   "If the claimant had to lie down like he indicated, three hours a day during the work day, are those jobs effected?"

A.   "Yes, ...."

Q.   "What if his pain did not allow for concentration one-third to two-thirds of the day. If he can't stay on task that period of time are those jobs also ruled out?"

A.   "Yes, ...." R. 278-281.

The vocational expert also gave the following response to a question asked by counsel for claimant:

Q.     "... [I]f you had an individual that two days a week was going to be off task during the day, cot completing work duties for one scheduled hour out of the day, and that's a total, because he would be taking fluid medication causing him to frequently go to the bathroom, how would that effect a person's employability?"

A.     "Well, that would eliminate those jobs."

## Synopsis of the Relevant Portions of the ALJ's Decision

"The onset date was amended at the hearing from April 30, 2003 to April 18, 2004 by an agreement with the claimant and his attorney." R. 21.

"The Administrative Law Judge gives great weight to Dr. Beard's examination report as it was based on objective medical and clinical evidence and supports the finding the Mr. Lamp was not precluded from light physical exertional work-related activities." R. 24.

"The Administrative Law Judge gives significant weight to Dr. Bragg's treatment reports and to the evaluations of Mr. Lamp's impairments. The undersigned believes the medical evidence in these reports do not materially change the findings from Dr. Beard's detailed physical examination discussed above. Moreover, the Administrative Law Judge also believes that all the medical reports from Dr. Bragg support the decision the Mr. Lamp was not precluded from light physical exertional work-related activities." R. 25.

"The state agency Physical Residual Functional Capacity (PRFC) date [sic] October 13, 2003 opined the [sic] Mr. Lamp's medical evidence did not establish any physical limitations. (Exhibits 2F) A second PRFC dated November 11, 2004, opined that Mr. Lamp had the physical capacity to perform light physical exertional work-related activities (Exhibits 4F). The Administrative Law

Judge agrees with the State Agency that Mr. Lamps impairment [sic] do not preclude light physical exertional activities." R. 25.

The medical evidence indicates that the claimant has mild degenerative disc disease and COPD, impairments that are 'severe' within the meaning of the Regulations but not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. The claimant's degenerative disc disease, best evaluated under listing 1.04, did not satisfy any of [sic] severity criteria such as stenosis or nerve root compression. The claimant's COPD evaluated under listing 3.02AB, as discussed in the PFT report above, did not satisfy the severity criteria of the listing." R. 25.

"There was no medical evidence to show that the claimant's healed s/p rib fractures have caused any significant medical impairment." R. 25."

"Mr. Lamp does not have any 'severe' work-related mental impairment. The claimant has had an anxiety diagnosis from his primary care physician (PCP) and has been prescribed Xanax. However, the claimant has never sought or received any mental health treatment despite having a medical card and his doctor has always checked his 'mental status' as normal." R. 25.

"There was no medical source opinion that opined that Mr. Lamp was precluded from all work-related activities. The Administrative Law Judge gives the claimant considerable benefit of the doubt as to his pain complaints in the establishment of the residual functional capacity (RFC) assessment as more fully discussed below." R. 26.

"The Administrative Law Judge does not find Mr. Lamp to be fully credible as to the nature and severity of his impairments in preventing him from performing at least light physical exertional work-related activities. He has moderate COPD yet he continues to smoke cigarettes against medical advice. In Mr. Lamp's functional report dated September 9, 2004 (Exhibits 6E) he reports he can

drive and shop for groceries. He is inconsistent as to activities of daily living; on one page he says he doesn't do laundry and only can fix sandwiches and used the microwave for meals. Yet he then says on another page that he does light laundry and the most time he spends in fixing a meal is 20 minutes, which he does on a daily basis. Mr. Lamp testified to essentially an 'invalid' life style yet he testified that this summer of 2005, he went on a five week vacation to Tampa, Florida. He said his cousin did the driving and it took them three days with a lot of stops and lots of pain pills. He returned from Florida by flying back to Pittsburgh and his son picked him up. The objective medical and clinical evidence from all treating sources, discussed above, does not in any way document or support the severe limitations that would reasonably be expected for the 'invalid' style as the claimant described in his testimony. The claimant does drive and there is a reference to using a riding lawn mower (see exhibit 5F). The ALJ notes that Mr. Lamp worked many years after his neck fusion and does not complain of neck pain (Exhibit 3F) Moreover, Mr. Lamp reported pain not severe as long as he does not cut grass (see exhibit 5F)." R. 26.

"Based on the testimony of the vocational expert, the undersigned concludes that considering the claimant's age, educational background, work experience, and residual functional capacity, he is capable of making a successful adjustment to work that exists in significant numbers in the national economy. A finding of 'not disabled' is therefore reached within the framework of Medical-Vocational Rule 202.11." R. 28.

**Relevant Findings:**

"3.    The claimant's mild degenerative disc disease and COPD are considered 'severe' ...."

"4.    These medically determinable impairments do not meet or medically equal one of the listed impairments...."

"5.    The undersigned finds the claimant's allegations regarding his limitations are not

totally credible for the reasons set forth in the body of the decision...."

"6.    The claimant has the ... residual functional capacity: he can perform a wide range of light physical exertional work-related activities with a sit/stand option. The work must be in clean air work environment. He must not be exposed to hazards such as unprotected heights or dangerous and moving machinery and he must not do any climbing."

"7.    The claimant is unable to perform any of his past relevant work...."

"8.    The claimant is an 'individual closely approaching advanced age'...."

"11.    The claimant has the residual functional capacity to perform a significant range of light work...."

"12.    Although the claimant's exertional limitations do not allow him to perform the full range of light work, ... there are a significant number of jobs in the national economy that he could perform. ... such jobs include work as a cashier with 15,000 jobs regionally and 1.5 million jobs nationally; as a doorman, with 300 jobs regionally and 50,000 jobs nationally; and as a gate guard with 700 jobs regionally and 1000 jobs nationally...."

"13.    The claimant is not under a 'disability,'...." R. 28-29.

### III.  Contentions of the Parties

Lamps Contentions:

1)    The ALJ breached a pre-hearing agreement to find Lamp disabled if he would amend his disability onset date to a later date than originally claimed, to wit: from April 13, 2003 to April 24, 2004.

2)    The ALJ erred because he improperly based his residual capacity finding on the opinions of

non-medical state agency employees.

3) The ALJ erred because he did not apply the correct well-settled credibility analysis required by the Fourth Circuit.

4) The ALJ erred because he did not include all of Mr. Lamp's limitations in the residual functional capacity finding or in the hypothetical questions to the vocational expert.

5) The ALJ erred because he did not consider all of Mr. Lamp's severe impairments.

Commissioner's Contentions

1) Substantial evidence supports the ALJ's decision that Plaintiff could perform light work.

2) There was no agreement to find Plaintiff disabled if he would amend his onset date.

3) The ALJ properly based his residual functional capacity finding on the opinion of RFC of Dr. Franyutti.

4) The ALJ properly evaluated Lamp's complaints of pain ( pain analysis) in accord with the two step process mandated by <u>Craig</u>.

5) The ALJ properly considered the claimed side effects of Lamp's medications.

6) The ALJ considered all of Plaintiff's severe impairments.

## **IV.** **Analysis**

### **Scope of Review**

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." <u>Smith v. Schweiker</u>, 795 F.2d 343, 345

(4ᵗʰ Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (<u>quoting</u> <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" <u>Hays</u>, 907 F.2d at 1456 (<u>quoting</u> <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

**Credibility**

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in <u>Craig v. Chater</u>, 76 F. 3d 585 (4ᵗʰ Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see*

*id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594.

The ALJ's decision in the instant case is not a model of clarity with respect to the two step pain analysis required under Craig v. Chater, Id.. as affirmed by the Fourth Circuit in Hines v. Barnhart, 453 F.2d 559 (4th Cir. 2006). However, a careful review of the decision and the record it is based on reflects that the ALJ did conduct the required two step analysis.

First, the ALJ discussed Lamp's medically determinable impairments as noted by Lamp's primary treating physician, Dr. Bragg, and as noted by Dr. Beard in the report of his October 18, 2004 consultative examination. With respect to Dr. Bragg, the ALJ noted: "[A]fter his hospital discharge, a follow-up visit ... on June 26, 2003 noted he was hurting from his fracture [sic] ribs areas and lower back. Additional problems were noted: Chronic obstructive pulmonary disease (COPD), chronic back pain due to generalized disc bulge, status/post multiple rib fractures with pain, and anxiety" R. 23. From the "Periodic Adult Health Visit" reports submitted by Dr. Bragg's office for the period of treatment from November 11, 2001 to December 2, 2004, the ALJ noted: "Dr. Bragg's [sic] consistently had the impressions [sic] of cervical back, and left shoulder blade pain COPD, and anxiety was occasionally mentioned. He apparently was prescribed Xanax since November 11, 2001. Through all of these 39 visits his 'mental status was always checked as 'normal.' There was little detailed medical information concerning the claimant's above physical conditions except indications of pain complaints. All other body systems in these reports were always checked as 'normal.' There was no physical functional information in these reports whatsoever. Six additional treatment reports dated February 2, 2005 to November 3, 2005 were

essentially the same as reports discussed above. There were no indications that Mr. Lamp had any other significant physical or mental problems." R. 24-25. Lamp's counsel lamented the failure of Dr. Bragg to provide a report at the outset of the hearing: "The other problem that we had is that we've been in contact with his treating doctors, Dr. Bragg, with his office on numerous occasions. Originally, we had quite a bit of hope that Dr. Bragg was actually **going to do something for Mr. Lamp in terms of writing a letter**, explaining his condition back to the motorcycle accident. We've just run into one of these situations where Dr. Bragg has just not done anything. He sent the medical reports." (emphasis added). R. 256-259. With respect to Dr. Beard's consultative physical examination, the ALJ noted the following with respect to Lamp's conditions and/or pain: 1) "reported that Mr. Lamp [sic] chief complaints were constant upper back pain near the left shoulder blade, constant lower back pain that radiates to both legs worse on the right leg." 2) "On physical examination, Mr. Lamp presented without ambulatory aids or assistive devices." 3) "He was able to arise from a seat and step up and down from exam table with a mild degree of difficulty." 4) "He was able to stand unassisted." 5) " He seemed comfortable seated and uncomfortable supine with back discomfort." 6) "The cervical spine revealed no tenderness over the spinous processes and no paravertebral muscular spasm. There was a well-healed right anterior neck scar." 7) "The exam of the arms reveled [sic] pain on motion testing of the left shoulder located in the left shoulder blade in the left upper thoracic region. Otherwise, the arms were normal as was the hands." 8) "[T]he dorsal lumbar spine had a normal curvature. Mild left thoracic paraverterbral [sic] spasm and some left lumbar paravertebral tender without spasm He could stand on either leg alone. There was no leg length discrepancy. Seated straight leg raising was 90 degrees without pain. Supine was 70 degrees with back pain on either side. Hips were without pain or tenderness." 9) "Neurological exam reveal [sic] weakness of the left shoulder graded at 4/5 with no sensory loss and no atrophy. Deep tendon

reflexes in the arms and legs 1+. Mr. lamp was able to heel and toe walk and tandem walk. He had some difficulty with squatting and arising from a squat with back pain." 10) "His lungs were clear to auscultation. There was a mild degree of dyspnea. PFT revealed moderate COPD and mild restrictive disease." 11) "The remainder of the examinations of all other body systems were within normal limits. An ex-ray of the chest was completely normal. The range of motion (ROM) form revealed lumbar spine forward bending to 75 degrees. All the other joints had normal ROM, including the left shoulder and cervical spine." R. 23-24.

Accordingly, the undersigned finds there is substantial evidence of record that the ALJ conducted an analysis of the limited medical evidence of record for "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged" and found conditions that could reasonable cause some pain but not the pain alleged.

Notwithstanding, the failure to be convinced that there were conditions shown by the medical evidence which were competent producers of the pain Lamp was alleging, the ALJ moved to the second prong of Craig to assess " *the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work....* " Id. The ALJ noted that "[t]here was no medical source opinion that opined that Mr. Lamp was precluded from all work-related activities." R. 26. Even though the ALJ gave benefit of the doubt to Lamp relative to his complaints of alleged pain and its affects on him, the ALJ concluded from inconsistencies in Lamp's functional report dated September 9, 2004; from inconsistencies in his activities of daily living; from the lack of any documentation or support from his treating or consulting physicians that he suffers severe limitations consistent with his claim of an invalid lifestyle, that Lamp could perform light work with certain restrictions. R. 26. It must also be noted that the ALJ was aware of and mentioned that Lamp had work until January 2003, long after his first wreck 12 years earlier that had resulted in neck surgery and long after his

medical records show he started taking narcotic medications to which he became somewhat addicted (2001) without any obvious problem with drowsiness. It was only after he retained the services of counsel around the time he filed his Disability Report Appeal on March 29, 2005, that he first mentions drowsiness from his medications. R. 133.

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

The undersigned therefore concludes that the ALJ's credibility analysis of Lamp's alleged pain was properly performed within the confines of Craig, and his conclusions are supported by substantial evidence from the record.

**Residual Functional Capacity Finding**

Lamp next complains that "[t]he ALJ erred because he improperly based his residual functional capacity finding on the opinions of non-medical state agency employees." DE 10 p. 7.

Counsel for Lamp attempts to cover his failure to specifically object to Exhibit 4F by contending in a footnote that his specific objection to Exhibit 2F was sufficient to also cover 4F. DE 10, p. 8. Even assuming that to be true, the facts with respect to Exhibit 4F are inconsistent with counsel's claim.

While it is true that Exhibit 4F, a Physical Residual Functional Capacity Assessment dated November 3, 2004, was signed by Mary Clevenger, a single decision maker, it was also signed by Fulvio R. Franyutti, MD on March 8, 2005 who noted thereon "I have reviewed all the evidence in file and assessment 11/03/04 is affirmed as written." R. 160. The Dr.'s review and affirmation was performed approximately eight (8) months prior to the evidentiary hearing held on November 15,

2005 and more than eight and one half (8 ½) months prior to the ALJ's decision. Contrary to Lamp's assertions, the ALJ in his decision only relied on the Residual Physical Functional Capacity Assessment affirmed by Dr. Franyutti: "The state agency Physical Residual Functional Capacity (PRFC) date [sic] October 13, 2003 opined the [sic] Mr. Lamp's medical evidence did not establish any physical limitations. (Exhibits 2F) A second PRFC dated November 11, 2004, opined that Mr. Lamp had the physical capacity to perform light physical exertional work-related activities (Exhibits 4F). The Administrative Law Judge agrees with the State Agency that Mr. Lamps impairment [sic] do not preclude light physical exertional activities." R. 25. Had the ALJ relied only on the October 13, 2003 SDM RFC as Lamp suggests, the ALJ would not have concluded Lamp had the capacity to perform only light physical exertional work-related activities. That limitation is only found in the RFC performed by SDM Clevenger and reviewed and affirmed by Dr. Franyutti, an acceptable medical source.

Accordingly, the undersigned concludes that Lamp's claim that the ALJ erred by basing his RFT on a RFC by a non-medical state agency employee is not supported by the evidence; is contrary to the substantial evidence in the record that the ALJ based his RFT on a RFC by Clevenger/Franyutti; and is therefor without merit.

**Failure to Consider All Limitations In The Residual Functional Capacity Finding or Hypothetical Questions to the VE**

Lamp complains the ALJ, without explanation, failed to consider the side effects of Lamp's pain and diuretic medications in his hypothetical questions to the VE.

At the hearing, Lamp testified he took Oxycontin, Lorcet, Naproxsyn and Lortab which made

him feel like he was in a fog or that his body was in slow motion[6]. R. 264. Lamp complained the

medications made him tired and that he would fall asleep on a daily basis. R. 264. Lamp also

complained the fluid medication he took two to three times per week caused frequency and urgency

in urination. R. 267-268. On cross-examination, the VE testified that frequent need to take

bathroom breaks would eliminate all jobs. R. 281.

Craig v. Chater, 76 F.3d 585, 592, the Fourth Circuit stated:

> . . . for disability to be found, an underlying medically determinable
> impairment resulting from some demonstrable abnormality must be
> established. While the pain caused by an impairment, independent
> from any physical limitations imposed by that impairment, may of
> course render an individual incapable of working, *see Myers v.
> Califano*, 611 F.2d 980, 983 (4th Cir. 1980), allegations of pain and
> other subjective symptoms, without more, are insufficient. As we said
> in *Gross v. Heckler*,'[p]ain is not disabling *per se*, and subjective
> evidence of pain cannot take precedence over objective medical
> evidence or the lack thereof.' 785 F.2d 1163, 1166 (4th Cir. 1986)
> (quoting *Parris v. Heckler*, 733 F.2d 324, 327 (4th Cir. 1984); *see also*
> 20 C.F.R. §§ 416.928(a) & 404.1528(a) ('[A claimant's] statements .
> . . alone . . . are not enough to establish that there is a physical or
> mental impairment.')

> In order to make this statutory requirement even more plain,
> Congress in 1984 amended Title II of the Social Security Act,
> purportedly to codify the regulatory standard for evaluating pain. *See*
> S.Rep.No. 466, 98th Cong., 2d Sess. 23-24 (1984); H.R. Conf. Rep.
> No. 139, 98th Cong., 2d Sess. 29 91984), *reprinted in* 1984
> U.S.C.C.A.N. 3080, 3087-88. The amendment, in language which
> closely paralleled the secretary's 1980 regulations, *see* 20 C.F.R.
> §§416.929 & 404.1529 (1983) provides that

> [a]n individual's statement as to pain or other

---

[6]As previously noted, Dr. Bragg's records do not note complaints of these alleged effects of the narcotic medications by Lamp until he obtained counsel in 2005. The record further reflects that Lamp worked as a welder until his job ended in January 2003 while taking these same narcotic medications. These are the same medications Dr. Bragg confirmed Lamp was taking at the time he saw his long time patient in the hospital following the April 2003 motorcycle wreck. They are the same medications to which Dr. Bellotte believed Lamp had some narcotic dependence. R. 138-139.

symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all the evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability. Objective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory diagnostic techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether  the individual is under a disability.

The Fourth Circuit also noted in <u>Craig</u>:

This is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers:

We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled. We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements

and the rest of the evidence, including your medical history, the medical signs and laboratory findings, and statements by your treating or examining physician or psychologist or other persons about how your symptoms affect you. *Your symptoms, including pain, will be determined to diminish your capacity for basic work activities . . . to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.*

Id. at 595-596.

In <u>Koonce v. Apfel</u>, 166 F.3d 1209 (4th Cir 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record.

<u>Lee v. Sullivan</u>, 945 F.2d 689 (4th Cir. 1991)(noting that a requirement introduced by claimant's counsel in a question to the VE "was not sustained by the evidence, and the vocational expert's testimony in response to the question was without support in the record.")

In <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235 (4th Cir. 1984), the Fourth Circuit stated:

We cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. <u>See, e.g.</u>, <u>Myers v. Califano</u>, 611 F.2d 980, 983 (4th Cir. 1980); <u>Stawls v. Califano</u>, 596 F.2d 1209, 1213 (4th Cir. 1979); <u>Arnold v. Secretary</u>, 567 F.2d 258, 259 (4th Cir. 1977). As we said in <u>Arnold</u>: The courts . . . face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all the evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." 567 F.2d at 259. Neither the ALJ nor the Appeals Council indicated the weight given to the various medical reports submitted by the appellant. We therefore remand to the district court with instructions further to remand the case to the Secretary with directions to the Secretary to reconsider the case and to indicate explicitly the weight accorded to the various medical reports in the record.

In his decision the ALJ stated: "There was no medical source opinion that opined Mr. Lamp

was precluded from all work-related activities." R. 26. The ALJ found that "Mr. Lamp does not have any 'severe' work-related mental impairment." Even though Lamp's primary care physician prescribed Xanax, the ALJ found that Lamp "never sought or received any mental helath treatment despite having a medical card and his doctor ... always checked his 'mental status' as normal." R. 25. The ALJ did not find Lamp "to be fully credible as to the nature and severity of his impairments in preventing him from performing at least light physical exertional work-related activities." R. 26. Thereafter, the ALJ discussed various inconsistencies between what Lamp said he could not do and what he said he did or did leading the ALJ to the further conclusion that "[t]he objective medical and clinical evidence from all treating sources, ..., does not in any way document or support the server limitations that would reasonably be expected for the 'invalid' style as the claimant described in his testimony." R. 26. The ALJ noted that Lamp continued to work for years post neck fusion without complaints of pain and stated that his pain was not severe as long as he did not cut the grass." R. 26.

The ALJ is required to discuss relevant evidence. Gordon v. Schweiker, *supra* at 235. However, testimony of inability to do light work because he falls asleep or has to go to the bathroom frequently due to prescribed medications he takes, is not relevant when there is no evidence in the record to support those assertions. Lamp points to no medical record and the undersigned was unable to find a notation in the record that Lamp complained to his treating physician that he was unable to function because his medications were causing him to fall asleep or to go to the bathroom. Such testimony is part of that which was discounted by the ALJ's finding with respect to credibility.

With respect to Lasix, Lamp testified he takes it "two to three times per week" and the effect of the medication starts wearing off in "about eight hours." R. 267-268. Lamp offers nothing to suggest he could not take the medication at some point following work and during the 16 hours he would not ordinarily be at work such that its effects (frequency of urination) would not be worn off

by the next time he would be due to report for work.

Moreover, there is no objective evidence to support that Lamp is unable to perform the duties of light work. The records of his treating physician offer no such proof. The records and evaluation of Dr. Beard support the ALJ's conclusion that Lamp is able to perform light work.

Given that the ALJ has broad discretion with respect to the hypothetical questions he poses to the VE and given the lack of objective evidence in the record to support any question based on Lamp's testimonial claims that he cannot work because he falls asleep and has to go to the bathroom frequently, the undersigned concludes the ALJ's decisions to not consider the testimony of the VE that such conditions would preclude all employment is supported by substantial evidence.

## Failure To Consider All Of Lamp's Severe Impairments

Lamp contends the ALJ erroneously failed to consider his thoracolumbar strain with chronic musculoskeletal thoracolumbar pain and left shoulder fracture.

This assertion is without merit with respect to both the left shoulder fracture and the thoracolumbar strain and pain. Based on the following and previously noted thorough review of the record, the undersigned finds that substantial evidence in that record reflects that the ALJ considered Lamp's complaints of left shoulder fracture and pain and upper and lower back pain and discounted them as limiting him to less than restricted light work.

Thoracolumbar[7] is simply a term that describes areas of the spine. It does not itself describe or identify any particular condition in those areas of the spine. With respect to the thorasic and lumbar areas of Lamp's spine, the ALJ noted: "The claimant complained of ongoing upper and lower back pain. Examination revealed left thoracic paravertebral musclar spasm, left paravertebral lumbar

---

[7]Thoracolumbar - pertains to the thoracic and lumbar parts of the spine. <u>Dorland's Illustrated Medical Dictionary</u>, 27th Edition.

tenderness, mild motion loss, negative SLR and negative neurological exam for radiculopathy."

With respect to the left shoulder fracture suffered in a 2003 motorcycle accident, the ALJ noted: "The claimant complained of ongoing upper and lower back pain. ... In his left shoulder blade there was mild pain with full ROM and mild weakness in the left shoulder."

It is true that the ALJ gave "great weight to Dr. Beard's examination report as it was based on objective medical and clinical evidence" as suggested by Lamp's counsel in his brief. What counsel neglected to include in his summarization of the ALJ's finding is that the ALJ considered Dr. Beard's examination and findings as objective proof supporting "the finding that Mr. Lamp was not precluded from Light physical exertional work-related activities." R. 24

**Failure To Abide By Alleged Agreement To Award Disability If Lamp Amended His Onset Date**

Lamp, by counsel argues, he made a deal with the ALJ to amend his claim onset date to April 24, 2004 if the ALJ would find him disabled.

The undersigned finds this assertion to be without factual merit.

Clearly there were discussions between counsel and the ALJ at the outset of the hearing concerning telephone calls made prior to the hearing to try to amend the onset date. R. 256-259. There is nothing in the colloquy that indicates the ALJ would give or accept a quid pro quo that Lamp be determined disabled should Lamp amend his onset date. The ALJ acknowledges counsel's statement that he thought his office rejected an April 24, 2004 onset date because Lamp intended onset to be the same as the motorcycle accident, April 13 2003. That acknowledgment does not amount to an acceptance of an agreement. There was no statement on the record that amounts to an offer by Lamp to amend his onset date provided the ALJ find him disabled nor was there any statement on the record by the ALJ that he would find Lamp disabled if Lamp would amend his

onset date. The fact that the ALJ proceeded with the hearing is indicative of no agreement.

In the case of <u>Talanker v. Barnhart</u>, 487 F.Supp.2d 149 (E.D.N.Y.,2007) Talanker appealed an award of disability benefits with an onset date of August 8, 1994 which his counsel had stipulated to in writing contending he did not understand what he was signing and that his actual onset date should have been March 8, 1993. Based on the record, the reviewing Court found that Talanker was suffering from a disabling mental illness at the time of the hearing and appeared to have difficulty in understanding the proceedings, including the stipulated amendment of his onset date. The Court concluded that the evidence was inconclusive as to whether Talanker "knowingly consented to the amended onset date identified by his attorney." *Id.* at 156. The Court went on to hold that "...the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record. ... Therefore, even if Mr. Talanker consented to the entry of the stipulated date of onset, the ALJ is required to ensure that the date selected had a legitimate medical basis." *Id.*

The undersigned concludes that no agreement was made between the ALJ and Lamp to the effect that the ALJ would find Lamp disabled if he would amend his onset date. In addition, even if there were such an agreement, the ALJ would still be obligated to make any ruling on disability based on and not inconsistent with the evidence[8].

## V. RECOMMENDED DECISION

For the reasons above stated, the undersigned recommends Defendant's Motion for Summary Judgment be **GRANTED**, Plaintiff's Motion for Summary Judgment be **DENIED**, and

---

[8]If this matter were to be remanded for any reason, the onset date would have to be factually determined in accord with law inasmuch as the agreed onset date of April 2004 is not supported by the evidence of the motorcycle accident of April 2003 or the evidence that it was Lamp's intent to amend his onset date to coincide with the motorcycle accident.

this matter be dismissed from the court's docket.

Any party may, within ten days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Opinion/Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the Honorable John P. Bailey, Jr., Chief United States District Judge. Failure to timely file objections to the Opinion/Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Opinion/Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit an authenticated copy of this Opinion/Report and Recommendation to counsel of record.

Respectfully submitted this 25th day of September, 2008.

*John S. Kaull*

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE